UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SIMA NIZAMI,<br>    Plaintiff,<br><br>    v.<br><br>HARTFORD FINANCIAL SERVS.<br>GROUP, INC., et al.,<br>    Defendants. | No. 3:10cv970 (SRU) |

**RULING ON MOTION FOR RECONSIDERATION**

This case arises out of the defendants' termination of the plaintiff's employment. The plaintiff is Sima Nizami. The defendants are Hartford Financial Services Group, Inc. and Hartford Fire Insurance Co., Nizami's former employers. On December 15, 2011, the defendants filed a motion for summary judgment, which I orally denied following oral argument on June 1, 2012. On June 18, 2012, the defendants filed a motion for reconsideration. Doc. 128. That motion also sought additional discovery, and an extension of time to file an additional motion for reconsideration. For the reasons stated below, that motion is **GRANTED** but the relief requested is **DENIED**.

**I.     Background**[1]

   A. Nizami's Employment with The Hartford

Nizami began to work for the defendants while she was still in high school, around 1984, in the commercial insurance department. At some point, Nizami began working in the rates and policy forms department, doing clerical work. In November 1997, Nizami began to perform supervisory duties, including training employees and conducting annual reviews.

---

[1] All facts are drawn from the parties' responses to the motion for summary judgment, and are interpreted in favor of the non-moving party. Only those facts necessary to resolve the motion for reconsideration have been included in this section.

In April 1998, Nizami was promoted to senior administrative assistant. In that capacity, it was Nizami's job to train other employees. Nizami also prepared manual filings: she created cover letters, prepared state forms, attached documents to the filings, and then submitted the filings.

In 1999, Claire Dubord became Nizami's supervisor. Dubord took away Nizami's supervisory duties: she stopped Nizami from performing reviews, checking others' work quality, answering questions, and giving assignments.

In 2003, Jane Marston took over as Nizami's supervisor. That year Marston promoted Nizami to filing analyst. There are two types of filing analyst positions at The Hartford: personal lines and commercial lines. The personal lines were the fastest and easiest to file. When Nizami was promoted to filing analyst, she was given commercial lines, specifically in the worker's compensation and auto lines of business.

The commercial line filings used an application called "product registry." Product registry was a way to ensure that all of the information contained in a filing was available electronically for other users. All information that was included in the forms and the filing, including the specific contract language and content, was separately entered into the product registry system. That portion of the product registry process took approximately 30-45 additional minutes for each filing. Furthermore, after the filing was submitted, any changes had to be updated in the product registry system. If a file was approved, withdrawn, rejected, or changed, that information also had to be entered into the product registry system. That process could take an additional 5-10 minutes per filing. Product registry was not used for personal filings.

Dubord resumed management responsibility for Nizami in 2004. After Dubord became

Nizami's supervisor again, Dubord frequently took product registry assignments away from Nizami. Moreover, throughout 2004 – 2008, Dubord often waited until an assignment was close to deadline before giving it to Nizami as a "rush assignment." As a result, in order to complete the job properly, Nizami was forced to work early mornings, late evenings, and some weekends. Dubord did not do the same to Nizami's non-Afghani coworkers.

    B.  <u>Nizami's Performance at The Hartford</u>

In 2004, Nizami was recognized for excellent customer service through The Hartford Experience Recognition System. Throughout 2007, Nizami also consistently received positive performance evaluations. During 2006 – 2008, however, a number of employees at The Hartford complained about Nizami. Some of those complaints were made to Robert Beaudoin, an Assistant Vice-President at The Hartford.

According to Dubord, Nizami sometimes struggled with written and verbal communication. Dubord alleges that she received several complaints from people at The Hartford who told her that they had trouble understanding Nizami's messages. On multiple occasions, Dubord asked Cheryl King, Nizami's coworker, if Nizami had asked for help with her English. King stated that Nizami speaks and writes English well, and that Nizami did not ask for, or need, any help with English. King later heard Dubord asking other coworkers if Nizami had asked them for help with her English. In September 2008, Nizami had a one-on-one meeting with Dubord, in which Dubord told Nizami that people who worked with Nizami had trouble understanding her because of her accent.

In February 2008, Dubord administered a performance evaluation for Nizami. In that evaluation, Dubord said that Nizami was successful in many areas. Dubord said that Nizami was respectful, determined, and hard-working. Dubord also stated, however, that "this past year has

been a challenge." Dubord encouraged Nizami to continue to work hard, and said that her goal for Nizami was for Nizami to become a proficient filer.

Other evidence indicated that Nizami excelled as a filing analyst. She worked occasionally on weekends, cleaned up a three-year backlog in product registry, and was considered a "product registry expert." Moreover, in 2008, Nizami created a detailed training package to show other employees how to work with product registry.

C. Nizami's Termination

On September 26, 2008, Dubord met with Nathan Fackrell, the Human Resources Generalist assigned to the Applied Research and Product Development department at that time. During the meeting, Dubord told Fackrell that Nizami was making an unacceptable number of errors in her filing. Dubord asked for Fackrell's advice in dealing with the situation. Fackrell told Dubord about the company's progressive discipline process, and that Dubord needed to document performance problems and help Nizami understand what the problems were.

In October 2008, Dubord met with Beaudoin to strategize a way for dealing with Nizami. Around that same time, Beaudoin was part of a conversation that there might be a reduction in force at The Hartford. Beaudoin has testified that as part of that initiative, he asked Dubord to consider whether she could eliminate a position in her department. Beaudoin was motivated not only by a desire to keep his workforce as lean and efficient as possible, but also by the fact that he had heard Nizami was having performance problems.

After Beaudoin asked Dubord to look into whether she could eliminate a filing position, Dubord reached out to Karen Griffin, an employee at The Hartford. Dubord testified that Griffin had more experience with The Hartford's data system, ITG. ITG was a system into which all filing analysts would enter the amount of time they spent on each line of business. For each

analyst, Dubord and Griffin took the number of hours spent on filing (which was reported in ITG), and divided that by the total number of filings submitted (which was reported on a system called SERFF). The resulting number, Dubord testifies, was the average amount of time spent on each filing.

Nizami denies that Dubord's estimation was an accurate measure of performance because, as discussed above, Nizami performed commercial filings, which took longer than personal filings. Nizami also performed a great deal of product registry work, which took 30-45 minutes per filing, while for the majority of 2008, her co-workers Angela Isaac, David Logan, and Joyce Driscoll were not required to do product registries. In fact, Nizami was expected to perform the product registry work for commercial filings submitted by Isaac, Logan, and Driscoll. When Isaac, Logan, or Driscoll performed a commercial filing they would receive credit for having submitted the filing, even though they had not performed the most time-consuming part of the work. When Nizami helped her coworkers with their filings, she had to report that she was spending time on filings, but did not receive credit for each filing being submitted. Additionally, in 2008, Nizami trained her coworkers and some consultants on product registry work. That time was counted as time spent on filings, even though no filings were submitted.

The defendants allege that even if you take Nizami's product registry work from the calculation, she was still the least productive employee. Nizami counters that it is impossible to calculate that, because the product registry work was not factored into a separate bucket until August or September 2008, and thus there is no way to take it out of prior calculations. Indeed, The Hartford's system did not keep track of who did what work, but only which filer pushed the final "submit" button. In any case, Dubord reported the above findings to Beaudoin.

On or about October 8, 2008, Dubord filled out an interim evaluation for Nizami. In that evaluation, Dubord said that Nizami's performance had been inconsistent. Dubord also said that the quality and quantity of Nizami's filings had been low. Nizami submitted a written response to that evaluation, arguing that her filing numbers were low because Dubord was not giving her filings, and because she was spending her time helping her colleagues with their filings.

Beaudoin eventually recommended eliminating a filing position, taking administrative duties away from a filer, and giving those administrative duties to a new part-time administrative person. Fackrell approved that plan.

On October 13, 2008, Fackrell instructed Beaudoin to rank each filer. The filers were ranked on: leadership, strategic thinking/problem solving, business partner focus, technology knowledge, communication, and self-management. Beaudoin forwarded Fackrell's request to Dubord, and Dubord ranked the filers. Nizami was ranked the lowest by far.

The rankings were submitted to Human Resources in October 2008, and based on that comparison, Nizami was slated for termination. Nizami was notified of her termination on November 3, 2008. Nizami's position was eliminated effective January 3, 2009. At that time, Nizami was told that her termination was not related to her performance.

D. Evidence of Discrimination

Nizami was born in Afghanistan. Her race and ethnicity are Middle Eastern (or, more specifically, Persian). When Nizami applied to work at The Hartford, she listed her race as white, because she was unsure of which of the provided options applied to her; there was no box for "Persian" or "Afghani." When asked, Nizami typically identifies herself as Afghani or Persian. Some of The Hartford's internal forms describe Nizami as "Asian." Around 1999, Dubord learned that Nizami was originally from Afghanistan. Nizami's hair and eyes are dark,

and her skin is olive-colored.

Nizami alleges that Dubord made a number of discriminatory remarks to her during the course of her employment. One time when Nizami was in Dubord's cubicle, Dubord told Nizami that Nizami should be grateful to have a house and son in college, because "if you still lived in your country, you wouldn't even have a hut to live in, and college would be a dream." Nizami does not recall when that remark was made, but believes it was sometime after she was promoted to analyst.

Once, after Nizami had highlighted her hair, Dubord told her, "that does not look good on you; you're not white." Another time, Dubord asked Nizami if Nizami had dated her husband for long before marrying him. When Nizami answered no, Dubord said, "Oh yeah, *you people* just get married without knowing the person."

In early 2008, Nizami and Dubord were both exercising at The Hartford's gym, when a television broadcast aired a report about Afghanistan. Dubord walked over to Nizami and laughingly said, "You always say you're allergic to dust, but where you come from you shouldn't have any allergies. Look at the dust and dirt [in Afghanistan]."

The Hartford offers paid time off to employees who volunteer. When Nizami asked Dubord for volunteer time to work at the polls for Election Day in 2008, Dubord responded that Nizami would have to take vacation time. Dubord then told Nizami, "if the blacks win this election then all the foreigners are going to take the jobs." Dubord had six filing analysts who reported to her. In addition to Nizami, there were three white employees, one Hispanic employee, and one black employee. In the past couple of years, only Nizami and the black employee were terminated.

Beaudoin has testified that as far as he knew, Nizami was white. He testified that he was

unaware of Nizami's national origin. Nizami's work space was close to Beaudoin's, and Beaudoin knew that Nizami had olive skin, dark hair, and spoke with an accent. Additionally, at one point Nizami took a trip to Pakistan. A coworker sent an email around the office stating that Nizami was going to Pakistan for a visit "home."

## II.   Standard of Review

The standard for granting a motion for reconsideration is strict; motions for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might be reasonably expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Motions for reconsideration will not be granted where the party merely seeks to relitigate an issue that has already been decided. *Id.* The three major grounds for granting a motion for reconsideration are: (1) an intervening change of controlling law, (2) the availability of new evidence, or (3) the need to correct a clear error or prevent manifest injustice. *Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citing 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practices & Procedure* § 4478).

## III.   Discussion

The defendants believe I erred in my ruling on the motion for summary judgment. They also seek to have discovery reopened, and to extend the time in which they can file a motion for reconsideration.

A.   <u>Motion for Reconsideration</u>

The defendants argue that I made a number of errors in my summary judgment ruling. Specifically, they claim that I: (1) erred in analyzing the law applicable to determining race under 42 U.S.C. § 1981, and (2) erred in analyzing the significance of the remarks made by

Dubord.  Both arguments are incorrect.

        1.  *Race in a Section 1981 Claim*

In order to demonstrate that a decisionmaker discriminated on the basis of race, the plaintiff must demonstrate that the decisionmaker was aware of the plaintiff's race.  *McDowell v. T-Mobile USA, Inc.*, 307 F. App'x. 531, 533-34 (2d Cir. 2009).  Nizami has presented evidence of the following facts from which a jury could find that the decisionmakers at The Hartford, including Dubord, knew she was Middle Eastern: (1) Dubord knew Nizami was from Afghanistan; (2) Nizami had dark hair and eyes and olive skin; (3) on one occasion Dubord told Nizami that she did not look good with highlights because she was "not white;" (4) when, during her deposition, Dubord was asked to identify the race of all of her employees, she described Nizami as "from Afghanistan;" and (5) several forms from The Hartford list Nizami's race as "Asian."  Even if I do not consider the statement about Nizami not being white, *see below*, I would still conclude that a jury had sufficient evidence to find that Dubord knew Nizami's race.

In support of their motion for reconsideration, the defendants cite *Woods v. Real Renters Ltd.*, No. 01cv0269, 2007 WL 656907 (S.D.N.Y. Mar. 1, 2007).  The plaintiffs in that case had spoken with the defendant over the phone, but had never met him in person.  *Id.* at *10.  There was also no evidence in that case that any person who had met the plaintiffs had told the defendant their race.  *Id.*  Here, in contrast, the uncontroverted evidence is that Nizami and Dubord knew each other for several years before Nizami's termination.  Nizami has olive skin and dark hair and eyes, speaks with an accent, and is known to be from Afghanistan.  There is therefore more than enough evidence from which a jury could find that Dubord was aware of Nizami's race.

Nizami has also presented evidence from which a jury could conclude that Beaudoin was

aware of Nizami's race.  Again, the evidence demonstrates that Beaudoin had met Nizami in person.  As a result, Beaudoin would have known Nizami had olive skin and dark hair and eyes, and that she spoke with an accent.  Beaudoin also received a mass email sent by Nizami's coworker that stated that Nizami was going "home" to Pakistan.  Although Nizami is originally from Afghanistan, not Pakistan, that information, along with Nizami's appearance and accent, are enough evidence for a jury to conclude that Beaudoin knew Nizami was Middle Eastern.

      2.   *Significance of Dubord's Remarks*

The defendants next argue that I improperly relied on stray remarks when deciding that circumstances in this case could give rise to an inference of discrimination.  The Second Circuit has held that when determining whether an allegedly discriminatory remark was probative, district courts may consider:

> (1) [W]ho made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).  The Court cautioned that "none of these factors should be regarded as dispositive."  *Id.* at 150.

The defendants argue that remarks unrelated to the decisional process are insufficient to demonstrate that the employer relied on illegitimate criteria, even when the statements were made by the decisionmaker.  No case cited by the defendants in support of that proposition is more recent than 1997, and most are from other Circuits or Districts.  In essence, the defendants seek for me to hold that the context of the remarks in question is dispositive, despite the fact that the Second Circuit has recently and explicitly said that I am not to do so.

Between 2004 and 2008, Dubord made several potentially discriminatory comments: (1)

"You say you're allergic to dust, but where you come from you shouldn't have any allergies. Look at the dust and the dirt [in Afghanistan];" (2) "if the blacks win this election then all the foreigners are going to take the jobs;" (3) "if you still lived in your country, you wouldn't even have a hut to live in, and college would be a dream;" (4) "you people just get married without knowing the person;" and (5) "that [hair dye] does not look good on you, you're not white." The number of remarks alone gives rise to an inference of discrimination. *Lafferty v. Owens, Schine & Nicola PC*, No. 3:09cv1045 (MRK), 2012 WL 162332, at *8 (D. Conn. Jan. 18, 2012).

B. Motion for Additional Discovery

The defendants next argue that they should be able to reopen the deposition of Sima Nizami, and take the deposition of Yusuf Nizami. The defendants argue that there were several inconsistencies between Sima Nizami's affidavit, submitted in opposition to the defendants' motion for summary judgment, and her deposition. The defendants have identified the following inconsistencies: (1) the date when Dubord made the comment to Nizami about the dirt and dust in Afghanistan; (2) the date when Dubord told Nizami that she "should be grateful to have a house and son in college;" (3) that Nizami had told Yusuf Nizami about the discriminatory comments made to her; (4) that Dubord told Nizami highlights did not look good on her, because she was not white; (5) that Nizami believed The Hartford was incorrect that Nizami was the least productive employee; (6) that Dubord asked Nizami where Nizami was from; (7) that Nizami had told Dubord where she was born; and (8) whether Nizami had been told that she was white. I will address each piece of evidence in turn.

1. *Date of Dirt and Dust Statement.*

In her affidavit, Nizami testified that:

On one occasion, in or about early 2008, the televisions in the fitness center [where Nizami and Dubord exercised] were broadcasting a report about

>Afghanistan.  When Dubord finished her exercise on her treadmill, she walked toward me and began laughing.  Dubord stated: 'You always say you're allergic to dust, but where you come from you shouldn't have any allergies.  Look at the dust and the dirt [in Afghanistan].

Nizami Aff. at ¶ 44.

During the deposition, Nizami did not identify when that statement was made.  Her statements were not inconsistent, however, because Nizami was not asked when the statement was made in her deposition.  Therefore, the defendants may not now depose Nizami regarding that issue.

    2.  *Date of College Statement*

In her affidavit, Nizami testified that "[o]n one occasion in 2007 or 2008, Dubord told me that I should be grateful to have a house and a son in college because, 'if you still lived in your country you wouldn't even have a hut to live in and college would be a dream.'"  Nizami Aff. at ¶ 43.  In her deposition, however, Nizami was unable to recall when that comment had been made.  Nizami Depo. 89:16 – 91:5.

The date when a remark was made is a factor in determining whether it constitutes a "stray remark."  *Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).  Nevertheless, "[e]ven a single stray remark may bear a more ominous significance when considered within the totality of the evidence."  *Lafferty*, 2012 WL 162332, at *8 (internal punctuation omitted).  The record is undisputed that Dubord made the "dust and dirt" statement in 2008.  Moreover, a jury could conclude that between 2004 and 2008, Dubord made the statement about living in a hut and college being a dream, and said that "you people just get married without knowing the person."  A jury could view those statements as discriminatory, and evidence of discrimination, even if the college statement was made prior to 2008.  Therefore, the defendants may not now depose Nizami regarding the date of that statement.

3. *Statements Made to Yusuf Nizami*

In her affidavit, Nizami stated that:

> I never complained to anyone within The Hartford that Ms. Dubord treated me in a discriminatory fashion until after my termination. . . . To the best of my recollection, I did tell my husband and possibly my children about the discriminatory comments and unfair treatment I received from Dubord.

Nizami Aff. at ¶ 114.

During the deposition, Nizami engaged in the following conversation:

> Q: You do not, as you sit here today, remember telling a single person at The Hartford that Claire [Dubord] made any of the statements that you attribute to her in the Complaint?
>
> A: I don't remember.
>
> Q: I'm not even sure that's an answer. You don't remember if you remember. I just need to understand that as you sit here today, you cannot identify a single person that you did tell; is that correct?
>
> A: No. I don't remember.
>
> Q: So it is correct that you cannot identify a single person that you told about these statements.
>
> A: Yes.

Nizami Depo. 118:1 – 118:17. That testimony is not inconsistent with Nizami's affidavit. Defense counsel prefaced the question with "[y]ou do not . . . remember telling a single person <u>at The Hartford</u>." Thus, when defense counsel continued to ask Nizami whether she could identify a single person who was informed about the discriminatory comments, it was reasonable for Nizami to understand that as asking whether she had informed a single person <u>at The Hartford</u> about those statements. There is no indication that Yusuf Nizami worked at The Hartford, and thus no indication that Nizami's statements were inconsistent. Furthermore, Nizami disclosed in her responses to interrogatories that she had told her husband about the discriminatory

statements, and thus the defendants have suffered no prejudice.  The request to depose Yusuf Nizami is denied.

    4.  *Highlights Comment*

In her affidavit, Nizami testified that "[o]n one occasion after I highlighted my hair, Dubord told me that I did not look good with highlights.  She said something like, "it does not look good on you, you're not white.""  Nizami Aff. at ¶ 18.  Nizami did not mention this comment during her deposition.  Nizami does not object to reopening her deposition for the limited purpose of discussing the highlights comment.  Thus, the deposition may be reopened with respect to that issue.

    5.  *Whether Nizami Was Least Productive Employee*

In her affidavit, Nizami testified, "the defendant has claimed that I was the least productive employee, and took over five hours per filing.  This is not correct."  Nizami Aff. at ¶ 86.  In her deposition, Nizami was not able to identify who the best or worst performers in her group were.  Nizami Depo. 173:3 – 173:6; 236:3 – 263:6.  I do not believe these statements are inconsistent.  Although Nizami could not identify the employee she believed to be the best or the worst, she may still have had a general sense of her own performance, and have known that she was not the worst.  Thus, Nizami's deposition may not be reopened with respect to this matter.

    6.  *Whether Dubord Asked Nizami's Origins*

In their reply brief, the defendants claimed there were additional instances where Nizami's affidavit and deposition testimony were inconsistent.  In her affidavit, Nizami testified that "[w]hen Clair [sic] Dubord first met me, she asked on several occasions where I was from."  Nizami Aff. at ¶ 17. In her deposition, Nizami was engaged in the following interchange:

    Q:  Have you ever talked to your coworkers about how you came to the United States?

A: I don't know if they ever asked me.

\*     \*     \*

Q: Did you ever talk to people who were your coworkers about where you were from?

A: If there was a setting of some reason that the question came, of course.

Q: Do you remember who you told you were from Afghanistan?

A: Specifically, only Doug Wootten ever asked me.

Q: Doug Wootten?

A: Yes. When he saw my spelling of the name and the same doctor [named Sima], the same spelling, he asked me if I was from there, I said yes.

Q: And that's the only one of your coworkers you can recall asking where you were from?

A: He didn't ask me like where I am from. He said are you from there because the same name, I said yes. But I think everybody knew where I came from.

Nizami Depo. 76:6 – 76:8; 76:15 – 77:11.

Even if the affidavit and deposition were inconsistent, the inconsistency is not relevant to resolving the motion for summary judgment. What is relevant is that Dubord knew Nizami's race, ethnicity, and national origin: it does not matter whether she discovered that information by asking it, or if she learned of it through some other means.

    7.  *Dubord's Knowledge of Nizami's Origins*

The defendants also claim that Nizami's deposition was inconsistent with regard to whether Nizami had ever told Dubord her national origin. In her affidavit, Nizami testified: "After I explained [to Dubord] that I was from Afghanistan, Dubord made several comments that made clear that she did not view me as 'Caucasian' or 'White.'" Nizami Aff. at ¶ 17. In her deposition, Nizami responded to the following questions:

- 15 -

> Q: Did you ever tell Claire about where you were born?
>
> A: If she had asked, I would have definitely. I don't know.
>
> Q: You don't remember one way or another?
>
> A: I really don't remember if I said to her specifically, no, I don't.

Nizami Depo. 103:24 – 104:5. At other parts of the deposition, however, Nizami makes clear that Dubord knew Nizami was from Afghanistan, even if Nizami was not the one who told her. For instance, as noted above, at Nizami's deposition she discussed statements Dubord had made about the dirt and dust in Afghanistan. Therefore, the affidavit and deposition are consistent in showing that Dubord knew Nizami was from Afghanistan, which is all that is relevant for purposes of the motion for summary judgment.

      8. *Nizami's Belief that She was White*

Finally, the defendants believe they have identified an inconsistency with regard to whether Nizami identified herself as white. In her affidavit, Nizami testified: "When I came to America, a family from my church that had sponsored me in coming here helped me fill out forms. In filling out those forms, they told me to check the box for 'white' because I was not Hispanic, Black or Asian." Nizami Aff. at ¶ 13.

Elsewhere in her affidavit, Nizami stated, "In filling out forms created by others, including the Hartford, I have sometimes found there is no option to identify my race or ethnic background as Afghan, Persian, and/or Middle Eastern. The choices are often limited to Black, Hispanic, Indian, American-Indian, Asian or White." Nizami Aff. at ¶ 11.

In her deposition, Nizami was asked:

> Q: Have you ever identified yourself as being white?
>
> A: Not identify – well, like in the job thing, like not that I, for example, I apply for Hartford, the categories are all these things that I don't know what they are, so

white is the one I know, so yes.  And also, the people in the church always have said to me you're white, so I thought I am, I don't know.

Nizami Depo. 67:16 – 67:23.

The affidavit and deposition can be consistently read to state that Nizami occasionally checked her race or ethnicity as "white" because no other box appeared to be applicable.  The statements may be slightly inconsistent with regard to whether the people in her church told her she was white, or told her that she should self-identify as white if no other option was more accurate.  In any case, what Nizami was told by members of her church is not relevant for purposes of determining the motion for summary judgment.  The defendants will have the opportunity to inquire further into any perceived inconsistencies at trial.

   C.  <u>Motion for Extension of Time</u>

Finally, the defendants seek a motion for extension of time to file a motion for reconsideration.  Under Local Rule 7(c)(1), "[m]otions for reconsideration shall be filed and served within fourteen (14) days of the filing of the decision or order from which such relief is sought."

I am only granting the defendants leave to reopen discovery with regard to Dubord's alleged statement that Nizami did not look good with highlights.  Even had I not considered that statement at the summary judgment hearing, I would still have denied the defendants' motion.  Therefore, the results of the reopened deposition will not affect my ruling on that motion, and the motion for extension of time is denied.

**IV.**   **Conclusion**

For the reasons stated above, the motion for reconsideration, doc. 128, is **GRANTED** but the relief requested is **DENIED**.  The defendants may, by consent, reopen Sima Nizami's testimony to inquire about the statements Dubord made about the highlights in Nizami's hair.

It is so ordered.

Dated at Bridgeport, Connecticut, this 20th day of August 2012.

                                                  /s/ Stefan R. Underhill
                                                Stefan R. Underhill
                                                United States District Judge

Case 3:10-cv-00970-SRU   Document 137   Filed 08/20/12   Page 18 of 18

- 18 -